## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JOSEPH OLIVEIRA, M.D.**,

     Plaintiff,

v.    Case No: 8:22-cv-01138-WFJ-SPF

**DOUG COLLINS,** Secretary,
Department of Veterans Affairs,

     Defendant.

_____/

## <u>ORDER</u>

Before the Court is Defendant Doug Collins's, Secretary of the Department of Veterans Affairs (the "VA"), Motion for Summary Judgment. Dkt. 60. Plaintiff Joseph Oliveira has filed a response in opposition, Dkt. 67, the VA replied, Dkt. 72, and Plaintiff filed a surreply. Dkt. 75.[1] Upon due consideration, the Court grants Defendant VA's Motion for Summary Judgment.

## I.    FACTUAL BACKGROUND[2]

Plaintiff Joseph Oliveira alleges that he was subjected to retaliation and a retaliatory hostile work environment while employed by C.W. Young Healthcare

---

[1] The Court also requested supplemental briefing from the parties, Dkt. 104, and only Defendant submitted a briefing. Dkt. 105.

[2] Pursuant to the Court's Case Management and Scheduling Order, Dkt. 25 at 2, the parties filed an agreed-upon statement of undisputed facts to narrow the factual issues in dispute in this action. *See* Dkt. 61; Dkt. 68.

System. Dkt. 61 ¶ 1. Plaintiff primarily argues that Defendant retaliated against him for engaging in protected activity by manipulating a peer-reviewed performance assessment done by the VA. Dkt. 30 ¶¶ 49–63, 74–81.[3]

### a.  Relevant Parties

C.W. Young Healthcare System is a Veterans Administration hospital and medical center in Bay Pines, Florida ("Bay Pines VA Hospital"). Dkt. 61 ¶ 1. The departments of Bay Pines VA Hospital are organized by the services they provide, including Radiology. *Id.* ¶ 2. Plaintiff is a radiologist who has worked at Bay Pines VA Hospital since 2005. *Id.* ¶ 5.

One of Plaintiff's supervisors, Dr. Carlos Martinez, served as Assistant Chief of the Radiology Department at Bay Pines VA Hospital from approximately October 2015 through early 2017. *Id.* ¶ 7. Dr. Martinez then served as Chief of the Radiology Department for approximately one year, stepping down in September 2018. *Id.* ¶ 9. During his tenure as Assistant Chief and Chief of Radiology, Dr. Martinez supervised Plaintiff Oliveira. *Id.* ¶ 10.

---

[3] Plaintiff's Amended Complaint raises additional claims for national origin and race discrimination (Count I) and age discrimination (Count III). *See* Dkt. 30 at 12, 17. However, Plaintiff's response to the motion for summary judgment states he is abandoning "his claims on the [basis] of national origin, race/ethnicity, or age" and "will solely address Defendant's arguments presented as they relate to his claims of retaliation (Count II) and retaliatory hostile work environment [(Count IV)] under Title VII." Dkt. 67 at 1. Accordingly, the Court grants Defendant summary judgment on Counts I and III. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atl.*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (citation modified) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. . . . [W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

Following Dr. Martinez's departure, Dr. Eric Lenz served as Chief of the Radiology Department from November 2018 to July 2024. *Id.* ¶ 11. Before becoming Chief, Dr. Lenz served as Assistant Chief of the Radiology Department in a non-supervisory role from January 2018 through November 2018. *Id.* ¶ 12.

On July 15, 2024, Dr. Maria Velasco assumed the role of Acting Chief of Radiology from Dr. Lenz. *Id.* ¶ 14. Like her predecessors, Dr. Velasco served as Plaintiff's supervisor when Plaintiff was working in the radiology service, but not while he was detailed to another service. *Id.*

The Chief of Radiology at Bay Pines VA Hospital reports to the hospital's Chief of Staff. *Id.* ¶ 15. Dr. Elamin M. Elamin has served as Chief of Staff at Bay Pines VA Hospital since April 29, 2019, and is part of the Plaintiff's chain of command. *Id.* ¶ 16. As of his deposition on November 22, 2024, Dr. Elamin remains the Chief of Staff and the Chief Medical Officer of the Bay Pines VA Hospital. *Id.*

### b. April 25, 2018, Incident and Subsequent Meetings with Dr. Martinez in May 2018

Plaintiff alleges that on April 25, 2018, he attended a radiology department meeting, where a coworker, Dr. Lucas, commented, "We have gotten rid of one guy," referring to Dr. Bui. Dkt. 68 at 5; Dkt. 30 ¶ 26(h). Dr. Lucas then turned, looked at Plaintiff, and stated, "Now we have to get rid of one more." Dkt. 68 at 5. Dr. Lenz also looked at Plaintiff and allegedly said, "What do we have to do to get

rid of him?" *Id.* Dr. Velasco then supposedly followed with, "Yeah, what more do
we have to do?" *Id.*

Plaintiff claims that he reported the April 25 incident to then-Radiology Chief
Dr. Martinez as "ongoing harassment" and a "hostile work environment" involving
Dr. Lucas and Dr. Lenz on May 9, 2018. *Id.* Nine days later, Plaintiff followed up
with Dr. Martinez to inquire about any ongoing investigation. *Id.* During this second
meeting with Dr. Martinez on May 18, 2018, Plaintiff informed Dr. Martinez that he
had initiated the Equal Employment Opportunity ("EEO") complaint process. *Id.*;
*see also* Dkt. 69-3 (showing the email chain between Dr. Martinez and Plaintiff
about initiating the EEO complaint process for harassment by Dr. Lenz).

Additionally, "around the end of 2018," Dr. Lenz allegedly told people that
"Plaintiff was lazy and connected it to Plaintiff's Hispanic ethnicity." Dkt. 30 ¶ 17.
In Plaintiff's interrogatories, Plaintiff answered that a coworker, Dr. Stein, and Dr.
Lenz "had a private conversation where [Dr. Stein] told Dr. Lenz that the treatment
[Plaintiff] was receiving was unfair[,] and Dr. Lenz replied to Dr. Stein that
[Plaintiff] deserved it and alluded to the fact that [Plaintiff] was a lazy,
troublemaking Hispanic." Dkt. 62-22 at 6. When asked about this allegation further
during his deposition, Plaintiff and his counsel stated that they were attempting to
obtain an affidavit from Dr. Stein attesting to the details of this conversation, but had

not yet been successful due to Dr. Stein's surgery to remove a brain tumor.[4] Dkt. 62-16 at 69:1-70:14.

### c. May 15, 2019 "MEC" Meeting and Plaintiff's First Summary Suspension

On May 15, 2019, the Medical Executive Committee ("MEC") of Bay Pines VA Hospital discussed the renewal of clinical privileges for several practitioners, including Plaintiff, whose privileges were set to expire on May 31, 2019. Dkt. 61 ¶¶ 18, 20. Chief of Staff Dr. Elamin and Chief of Radiology Dr. Lenz attended this MEC meeting. *Id.* ¶ 19.

As it pertains to Plaintiff, the meeting minutes stated that "[d]ue to the various quality of care concerns under discussion, it was recommended by MEC that the renewal of Dr. Oliveira's privileges be tabled today (placed on hold/non-renewal), while leadership further reviews the provider's clinical data to ensure patient safety for our Veterans is considered." *Id.* ¶ 21. Based on this recommendation, on May 20, 2019, Paul M. Russo, then-Director/CEO of Bay Pines VA Hospital, issued a memorandum to Plaintiff notifying him that his clinical privileges in the Radiology Service would be summarily suspended effective May 21, 2019. *Id.* ¶ 23; Dkt. 62-11. The memorandum specified that "[t]his action was being taken upon the recommendation of the Chief of Staff since concerns have been raised to suggest

---

[4] Defense Counsel noted that she "was informed by her contact at the VA that Dr. Stein was very ill and may pass soon." Dkt. 60 at 14 n.1.

that aspects of [Plaintiff's] clinical care may not meet the accepted standards of practice and potentially constitute an imminent threat to patient safety and welfare." Dkt. 62-11 at 2. Plaintiff's summary suspension would be in effect pending a Focused Clinical Care Review ("FCCR") of the listed "allegations, findings, and related information." *Id.* While on summary suspension, Plaintiff was temporarily reassigned to the Community Care Department at Bay Pines VA Hospital to perform administrative duties. Dkt. 61 ¶ 26.

### d. The 2019 FCCR

During the FCCR, the National Teleradiology Program ("NTP") reviewed 299 randomly selected cases that Plaintiff worked on.[5] *Id.* ¶ 27; Dkt. 62-13. A final FCCR report, dated August 28, 2019, stated that 5.4% of the peer-reviewed cases "did not meet the standard of care" and that two of those cases were categorized as an "egregious" miss. Dkt. 62-13 at 1. The 16 cases (which comprise 5.4% of the reviewed cases that failed to meet the standard of care) are listed in a table with peer-reviewed comments detailing various "mistakes" Plaintiff made. *Id.* at 4–5.

Plaintiff claims that the 16 cases that fell below the standard of care were not "randomly selected" and reviewed by the NTP panel. Dkt. 67 at 7–8; Dkt. 68 at 6. Plaintiff provides an "audit trail" showing that Dr. Lenz viewed all 16 cases in July

---

[5] NTP apparently excluded one of the 300 cases randomly selected. Dkt. 62-13. This exclusion of one CT case from the set of randomly reviewed cases was due to it having previously been identified as a target case. Dkt. 95-1 at 51:25–52:14. This change resulted in lowering the prior error rate of Plaintiff's reviewed CT scans from eight percent to 7.1 percent. *Id.* 52:4–10.

2019. Dkt. 69-6; *see also* Dkt. 75 at 2, 3–4. These audit trails were taken from the VA's Picture Archiving and Communication System ("PACS"), which shows who reviewed the case.[6] Dkt. 95-3 ¶¶ 2, 3; Dkt. 62-5 at 29:4-17; *see, e.g.*, Dkt. 69-6. Plaintiff alleges that Dr. Lenz had somehow "placed his thumb on the scale" to ensure the NTP panel found an error percentage outside the acceptable range. Dkt. 67 at 8. In his deposition, Dr. Lenz testified that the selection of cases in the FCCR was random and that he was not involved in the selection process. Dkt. 62-5 at 105:2-108:7.

Following the reopening of discovery,[7] additional audit trails were produced, and the deposition of Dr. Robert Sherrier, NTP's deputy director during the 2019 FCCR, was taken. *See* Dkt. 92-7; Dkt. 95-1; Dkt. 92-11. Dr. Sherrier testified that NTP used a different PACS system than the Bay Pines VA Hospital, but that the NTP system also tracked NTP radiologists' review of cases. Dkt. 95-1 at 23:20-25:15. This review, however, did not show up in the Bay Pine VA Hospital's PACS. *Id.* When questioned about the information the Bay Pine VA Hospital tracked in its PACS, Dr. Sherrier stated that he did not know. *Id.* at 25:1-15.

---

[6] PACS stores imaging for a radiologist to review, and it is the system the VA uses to send cases to NTP. Dkt. 62-5 at 29:4-17; Dkt. 95-1 at 23:13-24; Dkt. 92-6; Dkt. 92-11; Dkt. 95-3 ¶ 2.

[7] In Plaintiff's surreply, he filed a Federal Rule of Civil Procedure 56(d) request to reopen discovery. Dkts. 75, 76. On May 19, 2025, the Court granted Plaintiff leave to conduct additional limited discovery on the "NTP data," with a deadline of June 19, 2025. Dkt. 83. The Magistrate Judge's Order denying Plaintiff's motion to compel provides a detailed procedural background on what happened during discovery, which the Court incorporates by reference into this background section. Dkt. 103 at 2–6.

As to how Plaintiff's cases were sent to NTP for the FCCR, Dr. Sherrier testified that James Robinson, the PACS Administrator and IT manager for Bay Pines VA Hospital, sent David Pettit, NTP's Director at the time, an Excel spreadsheet of all of Plaintiff's cases within the specified timeframe, and Mr. Pettit completed the random selection of 300 cases. *Id.* at 13:2-24, 37:11-39:18 ("Yeah. So the data came from James Robinson in an Excel spreadsheet, looks like. And then David used his random number generator."); Dkt. 78-26 at 2 (showing emails between Mr. Robinson and Mr. Pettit on providing a list of cases Plaintiff worked on between April 2018 and April 2019). "[T]he cases were all selected and reviewed between May 23, 2019, and a few weeks before July 18, 2019." Dkt. 95-1 at 23:7-16.

Concerning any communications the NTP had with Dr. Lenz during Plaintiff's FCCR, Dr. Sherrier noted that Dr. Lenz "had no influence. In fact, he was insistent [on being] removed from the process to avoid any conflict. I remember that. He said it in his email." *Id.* at 45:15-21; *id.* at 12:11-16 ("And [Dr. Lenz] indicated that he didn't want to be part of the selection process to avoid bias."); Dkt. 78-24 at 2 (showing May 2019 email with Dr. Lenz telling Dr. Sherrier he wished to be removed from the FCCR process "as much as possible"); *see also* Dkt. 95-1 at 47:3-6 (noting that no one at the Bay Pines VA Hospital had any influence over NTP reviewers); *id.* at 53:3-54:20 (emphasizing that the Bay Pines VA radiology

8

leadership had no "improper influence" over the "randomly generated" sampling of cases selected for the FCCR competence review). When asked about the July 2019 email sent to Dr. Lenz, *see* Dkt. 78-20, Dr. Sherrier clarified that the FCCR had already been completed, and asked Dr. Lenz to add an addendum to the identified cases because "the referring provider needs to know that there's a change in the interpretation that would affect patient care. So, something has to go in the medical record to let them know that." Dkt. 95-1 at 49:11-50:16. The radiology chief (i.e., Dr. Lenz) would be responsible for ensuring this is completed, which is why Dr. Sherrier emailed Dr. Lenz. *Id.* at 50:22-51:5. Plaintiff did not seek to depose anyone else during the extended discovery period. Dkt. 103 at 4.

To summarize, Dr. Sherrier explained that Plaintiff's cases were sent to NTP for the 2019 FCCR based on following steps: (1) Mr. Robinson, the PACS IT manager at the Bay Pines VA Hospital, sent NTP a complete list of all Plaintiff's cases during a twelve-month period; (2) NTP's Director, Mr. Pettit, received the complete list of Plaintiff's work and used a random number generator to sort the cases into 100 cases of each modality—specifically, 100 CTs, 100 ultrasounds, and 100 x-rays; (3) NTP could receive cases from other VA facilities by exporting it or pulling it; and (4) NTP distributed 100 cases to each reviewing NTP radiologist for an initial review. Dkt. 95-1 at 10:1-11:17, 13:9-14:14, 36:8-39:18.

### e. January 2020 Review of Cases and March 2020 Admonishment

In January 2020, Plaintiff visited the Radiology Department at Bay Pines VA Hospital to review cases and prepare for his defense before the MEC concerning his summary suspension. Dkt. 61 ¶ 29; Dkt. 62-14. Plaintiff was given two days to review radiology cases pertaining to his summary suspension. Dkt. 61 ¶ 30; Dkt. 62-15. Dr. Lenz also instructed Plaintiff not to interact with any other radiology staff during his visit to review cases. Dkt. 62-15.

On March 2, 2020, Dr. Lenz emailed Plaintiff requesting that Plaintiff meet with him on March 4, 2020, and attached a proposed admonishment. Dkt. 62-18; Dkt. 62-19. The proposed admonishment specified that while reviewing his cases and preparing his defense in January 2020, Plaintiff had failed to follow Dr. Lenz's instructions. Dkt. 61 ¶ 32; Dkt. 62-19. Dr. Lenz had instructed Plaintiff "not to attempt to interact with the Radiology Staff" and that any questions related to the summary suspension should be directed to the Chief of Staff or the Chief of Quality Services. Dkt. 62-19 at 1. While at the Radiology Department, Plaintiff saw a coworker, Suzette Rivers, and asked her for information on the total number of cases he worked on and how often he was peer-reviewed each year. *Id.*; Dkt. 62-16 at 196:9-197:16. On April 3, 2020, Dr. Elamin issued a written admonishment, sustaining Dr. Lenz's charge of failure to follow instructions. Dkt. 62-20 at 1.

### f.  Plaintiff's First EEO Complaint

On April 16, 2020, Plaintiff contacted an EEO counselor at the VA and identified Dr. Lenz as a Responsible Management Official. Dkt. 61 ¶ 34; Dkt. 62-21. Plaintiff subsequently filed his first formal EEO complaint[8] on April 30, 2020, alleging that he was subjected to discrimination, retaliation, harassment, and a hostile work environment based on his age, Colombian origin, Hispanic ethnicity, and in retaliation for his EEO activity for events spanning from 2015 through March 6, 2020. Dkt. 61 ¶ 35; Dkt. 62-23. On June 15, 2020, the Office of Resolution Management of the VA ("ORM") informed Plaintiff that some, but not all, of his claims were accepted for investigation. Dkt. 61 ¶ 36; Dkt. 62-21. Specifically, the 14 instances of alleged harassment between 2015 and 2018 were dismissed under 29 C.F.R. § 1614.107(a)(2) because they occurred before "April 16, 2018 (two years from the initial contact date)," which failed to comply with the regulatory time limit. Dkt. 62-21 at 1–2.

As it relates to Plaintiff's discrimination claims, the ORM found that "Events 2 and 12 are discrete acts that were not raised within 45 days of occurrence and are therefore DISMISSED as independently actionable claims pursuant to 29 C.F.R.

---

[8] For clarification, Plaintiff filed an EEO complaint, not an EEOC complaint. Generally, the distinction turns on whether the employee is a federal or non-federal employee. EEO complaints are internal complaints filed within a federal agency, while EEOC complaints are complaints filed with the Equal Employment Opportunity Commission. During the EEO process, the federal employee must contact an EEO counselor within the agency and then file a formal complaint, which the agency will review internally.

§1614.107(a)(2) but will remain as part of the harassment claim." *Id.* at 4. The ORM also found that "Events 3, 17, and 18 constitute timely raised discrete acts that are also ACCEPTED for investigation as independently actionable claims and will remain part of the harassment claim." *Id.*

### g. Plaintiff's FPPE for Cause and Second Suspension of Privileges

Upon returning from his first summary suspension, Plaintiff was placed on a Focused Practical Professional Evaluation ("FPPE") for cause, which was initially scheduled to run from September 2020 to December 2020 but was subsequently extended to February 2021. Dkt. 61 ¶ 37; Dkt. 62-25 at 2, 18. Multiple findings of fact occurred during Plaintiff's FPPE for cause, and he also received a reprimand. Dkt. 61 ¶ 38; Dkt. 62-25 at 18–20; Dkt. 62-26 (showing January 21, 2021 reprimand).

The MEC ultimately determined that Plaintiff did not successfully pass all elements of his FPPE for cause. Dkt. 61 ¶ 39. Based on this determination, on March 11, 2021, Plaintiff's clinical privileges were summarily suspended a second time. *Id.* ¶ 46. On the same day, Plaintiff received a memorandum stating that his privileges were suspended for failure to successfully complete his FPPE for cause plan. *Id.* ¶ 47; Dkt. 62-29. Plaintiff was also informed that he would be temporarily reassigned to perform administrative duties in the Community Care Service. Dkt. 61 ¶ 48; Dkt. 62-30.

### h. Plaintiff's Second EEO Complaint

Plaintiff contacted an EEO counselor a second time on February 16, 2021, identifying Dr. Lenz, Dr. Elamin, and Dr. Velasco as Responsible Management Officials. Dkt. 61 ¶ 49; Dkt. 62-31. On April 10, 2021, Plaintiff filed a second formal EEO complaint alleging that he was subjected to discrimination, retaliation, harassment, and a hostile work environment based on his age, Colombian origin, Hispanic ethnicity, and in retaliation for EEO activity. Dkt. 61 ¶ 50. Plaintiff's second EEO complaint included new allegations concerning events from January 2020 through March 30, 2021. *Id.* ¶ 51. Again, the ORM informed that some, but not all, of his claims were accepted for investigation. The ORM dismissed Events 1 through 6 as "untimely independently actionable claims" pursuant to 29 C.F.R. § 1614.107(a)(2). Dkt. 62-31 at 2. Events 7 through 9, however, were accepted "for investigation as timely[,] independently actionable claims," and Plaintiff's overall claim of a hostile work environment was also accepted for investigation. *Id.* at 3.

### i. Instant Litigation

On May 16, 2022, Plaintiff filed suit against Defendant, alleging national origin and race discrimination, retaliation, age discrimination, harassment, a hostile work environment, and entitlement to injunctive relief. Dkt. 1. Plaintiff's initial Complaint was based on the allegations in his first EEO complaint, filed on April 30, 2020. *Id.* at ¶¶ 8–26. On December 8, 2022, Plaintiff amended his complaint to

add allegations from his second EEO complaint, filed on April 10, 2021. Dkt. 30 ¶ 38; Dkt. 27.

Defendant now timely moves for summary judgment, arguing that Plaintiff cannot show that any of the events he complains about have resulted from discrimination or retaliation. Dkt. 60.

## II.    LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the

non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e), (c). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The court may not weigh the evidence to resolve a factual dispute; if a genuine issue of material fact exists, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment if reasonable minds could differ on the inferences arising from undisputed facts. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

"The nature of a summary judgment movant's burden varies depending on which party would bear the burden of proof on a disputed issue at trial." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024) (citation omitted). "Where a defendant moves for summary judgment on an issue for which it would not bear the burden of proof at trial, it is not necessary for the defendant to entirely negate the plaintiff's claim." *Id.* (citation omitted); *see also Celotex Corp*, 477 U.S. at 323 ("[T]here can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Instead, the movant "has the burden

of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

Additionally, a district court is only required to consider "the cited materials" when deciding a summary judgment motion, Fed. R. Civ. P. 56(c)(3), and "[m]aking district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)).

## III.   DISCUSSION

Based on the review of the filings, the Court grants Defendant's motion for summary judgment. As discussed below, there is no genuine dispute of material fact that retaliatory animus played no part in the VA's employment decisions.

The Eleventh Circuit has recently explained that "to state a claim, the text[] of the federal-sector provision[] of Title VII . . . don't require a plaintiff to prove that unlawful discrimination was a but-for cause of adverse employment action." *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 862 (11th Cir. 2025) (citing *Buckley v. Sec'y of Army*, 97 F.4th 784, 794 (11th Cir. 2024) and *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1198 (11th Cir. 2021) ("*Babb II*")). Following these decisions, "to survive summary judgment, a federal employee doesn't have to satisfy the three-step [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] framework." *Id.* Title VII "demand[s] that personnel actions be untainted by any consideration" of the protected basis. *Babb v. Wilkie*, 589 U.S. 399, 402 (2020) ("*Babb I*") (opining on the ADEA); *see Buckley*, 97 F.4th at 793 (explaining that this same analysis applies to the Title VII federal-sector provision).

As explained previously, Plaintiff has abandoned his Title VII race and national origin (Count I) and ADEA age discrimination (Count III) claims and only defends "his claims of retaliation (Count II) and retaliatory hostile work environment [Count IV] under Title VII." Dkt. 67 at 1. The Court considers only Plaintiff's remaining claims in Counts II and IV. *See Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1326.

### a. Retaliation and Retaliatory Hostile Work Environment Claims

The Eleventh Circuit has long held that "discrimination," as used in Title VII's federal-sector provision, includes retaliation. *Babb II*, 992 F.3d at 1203. While Title VII prohibits retaliation against private-sector employees, *see* 42 U.S.C. § 2000e-3(a), it does not contain a comparable provision for federal employees. *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1354–55 (11th Cir. 2024). However, the Eleventh Circuit has "construed § 2000e-16(a)'s prohibition of 'any discrimination' to directly 'bar reprisals against federal employees who file charges of discrimination.'" *Babb II*, 992 F.3d at 1203 (quoting *Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir. 1981) (alterations accepted)).

"[B]ecause the same text that prohibits discrimination also prohibits retaliation, retaliation for engaging in protected conduct under Title VII . . . must not 'play[] any part' in any federal personnel action." *Rosado*, 127 F.4th at 876 (citing *Babb I*, 589 U.S. at 406–07 and *Babb II*, 992 F.3d at 1202). As such, "to make out a case of retaliation under [Title VII], a federal employee need not show that retaliation was the but-for reason for the employer's ultimate decision." *Id.* (citing *Buckley*, 97 F.4th at 798). Instead, it is sufficient for a plaintiff to establish that retaliation somehow contributed to the process that led to the final decision without having to satisfy the *McDonnell Douglas* framework. *Id.*

However, "if a federal employee wishes to satisfy his burden to show that retaliation tainted his employer's action by satisfying the *McDonnell Douglas* three-step framework, he may do so. Proving more than necessary to survive summary judgment on a claim of unlawful retaliation obviously proves enough to survive summary judgment on a claim of unlawful retaliation." *Id.* Indeed, "making out a prima facie case at step one of the *McDonnell Douglas* framework defeats summary judgment on a federal employee's retaliation claim." *Id.*

A plaintiff can make a prima facie case of retaliation by showing "that she (1) engaged in protected EEO activity and (2) suffered an adverse employment action, and (3) she must establish a causal link between the protected activity and the adverse action." *Terrell*, 98 F.4th at 1355 (citing *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)). Again, as to the causation element, a plaintiff "can establish a violation either by proving that her EEO activity was a but-for cause of her non-selection or by proving that retaliation tainted the final decision-making process." *Id.* at 1355 (citing *Buckley*, 97 F.4th at 798).

Plaintiff's response attempts to defeat summary judgment by applying the traditional *McDonnell Douglas* framework, arguing that Plaintiff has made a prima facie showing of retaliation. Dkt. 67 at 5. Because Plaintiff uses the *McDonnell Douglas* framework, the Court will do the same and begin with the prima facie elements of retaliation. "[T]his test requires a plaintiff to show that retaliatory

animus for engaging in Title VII . . . protected conduct tainted his employer's adverse employment action. After all, if (2) the adverse employment action was (3) causally related to (1) the statutorily protected expression he participated in, then the protected conduct necessarily played some role in the adverse employment action." *Rosado*, 127 F.4th at 876.

Additionally, the Court will analyze Plaintiff's retaliation and retaliatory hostile work environment claims together. Although the elements under a retaliatory hostile work environment claim differ slightly[9] from those of a retaliation claim, the same standard applies—i.e., whether the employer's action might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Buckley*, 97 F.4th at 799 (citing *Babb II*, 992 F.3d at 1207) ("[R]ecogniz[ing] that retaliatory-hostile-work-environment claims are 'really . . . retaliation claims . . . rather than hostile-work-environment claims.'"). Much like a traditional retaliation claim, "to state a claim for retaliatory hostile work environment, a federal-sector plaintiff must establish that, to retaliate against [him] for engaging in protected Title VII activity, [his] employer created or tolerated a work environment that 'well might have

---

[9] The difference is that, unlike Title VII retaliation claims, which are based on discrete acts, the "very nature" of a hostile work environment claim "involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Hostile work environment claims are based on the "cumulative effect of individual acts," each of which "may not be actionable on its own." *Id.* As such, courts treat the "series of separate acts" comprising a retaliatory hostile work environment claim as "one unlawful employment practice." *Id.* at 103 (internal quotations omitted). As discussed below, the distinction between a retaliation claim and a retaliatory hostile work environment claim is immaterial in this case, as each of the series of separate acts Plaintiff argues were materially adverse is sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination.

dissuaded a reasonable worker from making or supporting a charge of discrimination' and that environment rose to the level of a 'personnel action.'" *Id.* (quoting *Babb II*, 992 F.3d at 1207–09) (alterations accepted).

### i. Protected Activity

Beginning with element one, to demonstrate protected activity under the Opposition Clause, 42 U.S.C. § 2000e–3(a), a plaintiff must show that "he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). Under Title VII, "[s]tatutorily protected expression includes internal complaints of discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based lawsuits." *Gerard v. Bd. of Regents of State of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009) (citing *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001)).

Here, Defendant argues that "Plaintiff has admitted in this litigation that he did not engage in protected EEO activity until April 2020 when he filed his first EEO complaint." Dkt. 72 at 4. Plaintiff, however, points to his earlier May 2018 meetings with then-Radiology Chief Dr. Martinez, where Plaintiff reported "ongoing harassment" and a "hostile work environment," specifically referencing the April 25, 2018, incident involving Dr. Lucas and Dr. Lenz. Dkt. 67 at 6–7. While

Defendant is correct that Plaintiff's first EEO complaint was not filed until 2020, internal complaints made by Plaintiff to his then-supervisor, Dr. Martinez, about ongoing discrimination may reasonably be considered statutorily protected activity by a trier of fact. Furthermore, the internal complaint that Plaintiff made to Dr. Martinez pertains to unlawful employment practices, as the comments made by Dr. Lenz and Dr. Velasco were about "get[ting] rid" of (i.e., firing or removing) Plaintiff.[10] Dkt. 68 at 5. Thus, the Court finds that a reasonable jury could determine that Plaintiff's May 2018 complaints to Dr. Martinez constituted protected activity.[11]

### ii. Materially Adverse Action

As for element two, if Plaintiff had engaged in protected activity with respect to Dr. Martinez, Plaintiff must show that any resulting hostility "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay U.S., Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (citing *Burlington N. v. White*, 548 U.S. 53, 68 (2006)). The standards for judging hostility are intended to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S.

---

[10] The parties debate about the admissibility of Dr. Stein's alleged conversation with Dr. Lenz. *See* Dkt. 30 ¶ 17; Dkt. 62-22 at 6. Defendant argues that any statement from Dr. Stein is hearsay and cannot be considered on summary judgment. Dkt. 60 at 14. Plaintiff contends that the statement is not being offered for the truth of the matter asserted; rather, it is being offered for its effect on the listener. Dkt. 67 at 7 n.1. The Court need not wade into this evidentiary issue because Plaintiff has sufficiently shown he engaged in protected activity by reporting to Dr. Martinez in May 2018.

[11] Interestingly, Plaintiff's response never argues that any of his formal EEO complaints constituted protected activity under the Participation clause, 42 U.S.C. § 2000e–3(a). *See* Dkt. 67 at 6–7. Accordingly, the Court considers only the May 2018 complaints to Dr. Martinez to be the protected activity at issue.

775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Indeed, the Supreme Court has stated that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," distinguishing "significant from trivial harms," such as "petty slights, minor annoyances, and simple lack of good manners." *Burlington N.*, 548 U.S. at 68. Whether that is the case "will often depend upon the particular circumstances." *Id.* at 69. Additionally, actionable retaliatory conduct includes any conduct "which has a materially adverse effect on a plaintiff, irrespective of whether it is employment or workplace related." *Crawford*, 529 F.3d at 973 (quotations omitted).

Plaintiff relies on three employment actions following his May 2018 meeting with Dr. Martinez to support the materially adverse element. First, after Dr. Lenz became the Chief of the Radiology Department in November 2018, the MEC suspended Plaintiff's privileges pending the completion of the FCCR. Dkt. 67 at 7; Dkt. 62-11 at 2. While on summary suspension, Plaintiff was also temporarily reassigned to the Community Care Department at Bay Pines VA Hospital to perform administrative duties. Dkt. 61 ¶ 26. Plaintiff claims that the FCCR was not a random review of his cases. Dkt. 67 at 7–8. Rather, Plaintiff points to an "audit trail" that shows Dr. Lenz had reviewed all 16 cases the FCCR marked as below the standard of care. *Id.*; *see* Dkt. 69-6. Plaintiff argues that Dr. Lenz had somehow "placed his thumb on the scale" to ensure the NTP panels found an error percentage outside the

acceptable range, which ultimately led to Plaintiff being subjected to the FPPE for cause. Dkt. 67 at 8.

Second, Plaintiff points to being placed on an FPPE for cause based on the results of the FCCR, which was initially scheduled to run from September 2020 to December 2020 but was later extended. *Id.*; Dkt. 61 ¶ 37. On March 11, 2021, the MEC later determined that Plaintiff did not successfully pass all elements of his FPPE for cause and summarily suspended Plaintiff's clinical privileges a second time. Dkt. 61 ¶¶ 39, 46, 47; Dkt. 62-29.

Third, Plaintiff claims that Dr. Lenz's instructions not to speak to anyone in the radiology department while preparing his defense before the MEC in January 2020—and the subsequent written admonishment by Dr. Elamin for failing to follow these instructions—constituted retaliation. Dkt. 67 at 8–9.

Beginning with the third employment action, the Court finds Dr. Elamin's written admonishment for failing to follow instructions is not a materially adverse action. The Eleventh Circuit has found that written reprimands do not support a retaliation claim unless they cause tangible harm, which Plaintiff has not demonstrated. *See Rayner v. Dep't of Veterans Affs.*, 684 F. App'x 911, 915 (11th Cir. 2017); *Bush v. Regis Corp.*, 257 F. App'x 219, 222 (11th Cir. 2007); *Summerlin v. M&H Valve Co.*, 167 F. App'x 93, 96–97 (11th Cir. 2006). While it is undisputed that Plaintiff was only given two days to review his cases and that Plaintiff's request

24

did not disrupt Ms. Rivers, Plaintiff has not explained or pointed to evidence showing the March 2020 admonishment had a "materially adverse effect on [Plaintiff]." *Crawford*, 529 F.3d at 973; *see Perry v. Rogers*, 627 F. App'x 823, 832–33 (11th Cir. 2015) ("[The plaintiff] also appears to point to the fact that she received a written reprimand by [the defendant] for tardiness and insubordination in April 2011 as evidence of retaliation. Again, [the plaintiff] has failed to set forth any evidence showing how this written reprimand negatively affected her in a material way.").

As for the first and second employment actions, the MEC's summary suspension of Plaintiff's privileges pending the outcome of the FCCR and the FPPE for cause is a closer question. The suspensions of Plaintiff's privileges and reassignment to administrative duties likely had a materially adverse effect on the terms and conditions of Plaintiff's employment, as it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan*, 955 F.3d at 861. Defendant, however, argues that "it strains credulity that a jury could determine that events that took place *before* Plaintiff ever engaged in protected EEO activity could form the *entire* basis for his retaliation claims." Dkt. 72 at 4. The Court disagrees, as Plaintiff asserts he was engaged in protected activity through his May 2018 complaints to Dr. Martinez, which occurred *before* the materially adverse employment decisions.

Here, the suspension of clinical privileges and reassignment could reasonably dissuade a reasonable worker from making or supporting a discrimination charge. Indeed, being prevented from practicing medicine as a radiologist and being reassigned to only administrative duties undoubtedly "adversely affect[ed] [] [P]laintiff's conditions of employment." *Crawford*, 529 F.3d at 973; *see also Jones v. Aaron's Inc.*, 748 F. App'x 907, 917 (11th Cir. 2018) (cutting the plaintiff's hours after she took FMLA leave was materially adverse); *Burlington N.*, 548 U.S. at 73 (finding "the jury's conclusion that the 37–day suspension without pay was materially adverse was a reasonable one"). Therefore, the Court finds that a reasonable jury could find that Defendant's employment decisions—the first suspension of his privileges and reassignment due to the FCCR and second suspension following the FPPE for cause—were "materially adverse," as the undisputed facts show that a reasonable worker could be dissuaded from filing a charge of discrimination.

### iii.  Causal Link

With respect to causation, a plaintiff must show that the decision-maker knew of his protected activity and that the protected activity and adverse action were not wholly unrelated. *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). "At a minimum, [a plaintiff] must show that the adverse act followed the protected conduct[.]" *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir.

1999). "In the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007). The Eleventh Circuit has been clear that "mere temporal proximity, without more, must be very close." *Id*. (citation modified). A three to four-month gap is insufficiently proximate to establish causation. *Id.*

Here, the undisputed facts show that Plaintiff's first meeting with Dr. Martinez happened on May 9, 2018, and the second on May 18, 2018. Dkt. 68 at 5. However, the MEC meeting that led to the Plaintiff's first suspension and reassignment did not occur until May 15, 2019, Dkt. 61 ¶ 19, and the second suspension following the FPPE for cause did not happen until March 11, 2021. *Id.* ¶ 46. Thus, Plaintiff has failed to establish a causal connection through temporal proximity, given the substantial delay between the protected activity and the materially adverse actions, which occurred one to two years later. *See Thomas,* 506 F.3d at 1364; *Buckley*, 97 F.4th at 798–99 (finding that a seven to eight month delay between the protected activity and adverse employment action "is far too long to

allow for the inference that retaliation infected the decision-making process that resulted in [the plaintiff]'s dismissal").[12]

Plaintiff, however, argues that "[c]ausation here is shown by evidence of Lenz's impropriety in the peer review process and escalating disciplinary action, not by timing alone." Dkt. 67 at 9. As explained below, Dr. Lenz's alleged impropriety of manipulating the FCCR case selection process is based on Plaintiff's own unsupported assumptions, which are insufficient to defeat Defendant's motion for summary judgment, as "[s]howing a genuine issue for trial 'requires more than speculation or a mere scintilla of evidence.'" *Buckley*, 97 F.4th at 792 (quoting *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1122 (11th Cir. 2014)).

The undisputed evidence shows that the suspension of Plaintiff's privileges and placement on the FPPE for cause were justified by the FCCR results, which showed Plaintiff failed to provide an adequate standard of care to patients. *See* Dkt. 62-13; *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023) (noting that "the intervening discovery of employee misconduct can sever the causal inference created by close temporal proximity" and determining that "an employee-relations survey [that] uncovered substantial evidence of misconduct," including reports that the plaintiff "was a 'bully' or 'threatening' or 'abusive' at work,"

---

[12] To the extent Plaintiff relies on his first EEO complaint on April 16, 2020, to show temporal causation, this was five months before Plaintiff's FPPE for cause on September 18, 2020. Dkt. 61 ¶¶ 34, 37. Thus, these events are temporally too far apart to establish a causal link. *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1328 (11th Cir. 2020) (concluding that even two months—without more—is not close enough to establish retaliation).

"undercut[ ] the inference that [the plaintiff]'s complaints caused her termination"); *Duncan v. Alabama*, 734 F. App'x 637, 641 (11th Cir. 2018) (affirming grant of summary judgment on retaliation claim where, "even assuming [the decisionmaker] was actually aware [the plaintiff] had engaged in protected conduct by filing the internal complaint, the undisputed evidence demonstrate[d] [the plaintiff]'s demotion was justified and not motivated by bias").

      *iv. Whether Retaliatory Animus Played Any Part in Defendant's Adverse Employment Decisions*

As discussed above, the Eleventh Circuit has held that a federal employee can still defeat summary judgment on a retaliation claim without satisfying the "heavier" *McDonnell Douglas* framework. *Rosado*, 127 F.4th at 866 (citing *Buckley*, 97 F.4th at 794–95). "Rather, it's enough to establish that retaliation somehow figured into the process that led to the final decision." *Id.* at 876 (citing *Buckley*, 97 F.4th at 798).

The Court finds that a reasonable jury still could not determine that retaliatory animus "played any part" in the employment decisions that Plaintiff challenges. *Id.* at 876 (citation modified). While Dr. Lenz (as the new Chief of Radiology) and Chief of Staff Dr. Elamin attended the MEC meeting that recommended Plaintiff's first suspension of privileges and reassignment, the undisputed minutes from the meeting show that it was the Director/CEO of Bay Pines VA Hospital, Paul M. Russo, who made the ultimate decision to summarily suspend Plaintiff's clinical privileges in the Radiology Department. Dkt. 61 ¶ 23; Dkt. 62-11 at 4. Furthermore, although

29

Director Russo enacted the suspension based on "the recommendation of the Chief
of Staff [Dr. Elamin]," Plaintiff's response does not cite any evidence in the record
that suggests Dr. Elamin had retaliatory intent or animus behind recommending
Plaintiff's suspension. Dkt. 62-11 at 2. Indeed, Dr. Elamin was neither a party
involved in the April 2018 incident nor mentioned in Plaintiff's internal complaint
to his then-supervisor, Dr. Martinez, in May 2018. *See* Dkt. 68 at 5; *see also
Pennington*, 261 F.3d at 1270 ("Where a decisionmaker conducts his own evaluation
and makes an independent decision, his decision is free of the taint of a biased
subordinate employee.").

Nor has Plaintiff pointed to any evidence in the record showing that the
decisionmakers—Director Russo and Dr. Elamin—actually knew about Plaintiff's
protected activity to Dr. Martinez in May 2018 at the time they made the adverse
employment decision. *See Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 998 (11th Cir.
2025) (citation modified) ("In any retaliation claim, a plaintiff needs to show (among
other things) that the decisionmaker actually knew about the employee's protected
expression at the time they made the decision."). Thus, the record does not establish
that retaliation for the May 2018 protected activity tainted any adverse employment
decision.

As for Plaintiff's causation argument that he is "entitled to the inference that
[Dr.] Lenz was placing his thumb on the scale to ensure that Plaintiff's results

supported an NTP finding of an error percentage outside of the acceptable range," the Court declines to recognize this inference. Dkt. 67 at 8. The Court only needs to draw all "reasonable" inferences in Plaintiff's favor, *Pennington*, 261 F.3d at 1265, and based on the undisputed evidence in the record, no reasonable juror could find that Dr. Lenz somehow manipulated the 2019 FCCR conducted by an independent entity within the VA. In other words, Plaintiff's speculation about Dr. Lenz is not enough to "[s]how[] a genuine issue for trial." *Buckley*, 97 F.4th at 792.

First, there is no genuine dispute that Dr. Lenz was not on any of the two NTP panels that reviewed Plaintiff's cases. Dkt. 62-13 at 1 (explaining that a 3-person panel of board-certified radiologists initially reviewed all randomly selected cases, followed by a second panel of 3-5 radiologists who reviewed cases that fell below the standard of care); Dkt. 62-5 at 105:18-108:7 (Dr. Lenz testifying that the selection of cases in the FCCR was random and that he was not involved in the case selection); Dkt. 61 ¶ 27; Dkt. 68 ¶ 27. Email correspondence also shows Dr. Lenz removed himself from NTP's selection process for the FCCR. Dkt. 78-24 at 2; *see* Dkt. 95-1 at 12:11-16, 45:15-21 (showing Dr. Sherrier testifying that Dr. Lenz did not influence the NTP review process).

The extent of Dr. Sherrier's relationship with Dr. Lenz was the initiation of Plaintiff's 2019 FCCR, and possibly a phone call about other radiology matters while Dr. Sherrier was the national director of radiology. Dkt. 95-1 at 27:16-28:2.

Dr. Sherrier also testified that he did not recall Dr. Lenz ever indicating that he wanted to have Plaintiff removed from the Bay Pines VA Hospital Staff. *Id.* at 29:12-15. Nor did Dr. Lenz's characterization of Plaintiff during his initial contact with Dr. Sherrier regarding the initiation of the FCCR, in which Dr. Lenz communicated that he felt Plaintiff might be an "incompetent radiologist," influence the results of the FCCR. *Id.* at 46:18-47:2 ("Q. Would that characterization influence the results of the FCCR? A. No. I don't know how they could. I mean, he had a conversation with me, then there[] [are] other radiologists who had no information about the doctor they were reviewing."). Dr. Sherrier was also adamant that neither the Bay Pines VA Hospital nor any facility had any influence over the NTP reviewers assigned to a competency review. *Id.* at 47:3-6. Indeed, Dr. Sherrier testified that he was not aware of any improper influence from the radiology department leadership at Bay Pines VA Hospital with respect to the selection of cases for Plaintiff's FCCR or his FPPE for cause. *Id.* at 53:3-6.

Second, there is no genuine dispute that the FCCR, which found that Plaintiff had not met the standard of care in 5.4% of cases, was based on a review of 299 randomly selected cases, not just 16 cases picked by someone from the Bay Pines VA Hospital. *See* Dkt. 61 ¶ 28; Dkt. 68 ¶ 28; Dkt. 62-13 at 1; Dkt. 78-25 (showing email correspondence between Linda Kautz and Plaintiff confirming that cases would be randomly selected, managed through the administrative offices at NTP,

and not selected by any Bay Pines Hospital staff); Dkt. 95-1 at 11:11-17, 13:2-24,
37:11-39:18, 53:3-54:20 (showing Dr. Sherrier emphasizing numerous times that the
NTP selection of cases was randomly generated).

Third, the PACS "audit trails" of the 16 cases identified by the NTP as below
the standard of care do not create a genuine dispute about whether Dr. Lenz
"interfered" with the NTP's random selection process. Dkt. 67 at 8. The audit trails
only demonstrate that Dr. Lenz viewed the 16 cases on July 19, 22, 25, and 30, 2019.
*See* Dkt. 69-6. Importantly, the NTP had already completed its FCCR review on or
before July 18, 2019, *before* Dr. Lenz reviewed any exam images. Dkt. 78-20 at 1–
2 (showing email correspondence of Dr. Sherrier sharing the FCCR results with Dr.
Lenz on July 18, 2019, and requesting Dr. Lenz to add an addendum to some cases);
Dkt. 95-1 at 49:11-51:5 (showing Dr. Sherrier discussing the July 18, 2019, email
and explaining why he asked Dr. Lenz to add the addenda to certain cases).

Furthermore, undisputed email correspondence from Dr. Lenz demonstrates
that he was only aware of the FCCR results on July 18, 2019, and that he forwarded
them to Dr. Elamin and Linda Kautz, including information on next steps from the
VA National Guidelines for Radiology Professional Competency. *See* Dkt. 78-21.
Plaintiff's PACS "audit trail" argument neither explains how Dr. Lenz's viewing of
16 cases (after the FCCR was finished) influenced the NTP's review nor rebuts any

of the testimony from Dr. Sherrier.[13] Thus, the fact that Dr. Lenz reviewed certain cases in PACS does not create a genuine dispute of material fact concerning retaliatory animus or taint that would defeat summary judgment.

Fourth, to the extent Plaintiff also contends that Dr. Lenz somehow sent these 16 cases to the NTP ahead of time to retaliate against Plaintiff, the Court cannot find any evidence in the record—even after reopening discovery—to support such an argument. The only instance of alleged "cherry picking" is Dr. Lenz testifying that the MEC initially sent nine "trigger cases" to the NTP for review. Dkt. 62-5 at 72:2-15, 107:18-108:7. Out of the nine cases independently evaluated by the NTP, seven did not meet the standard of care, which triggered an FCCR. Dkt. 62-8 at 40:1-41:11; Dkt. 62-5 at 72:2-15, 107:18-108:7. After reviewing the nine trigger cases, the NTP requested all of Plaintiff's cases during a twelve-month period for a full FCCR. Dkt. 62-8 at 9:20-11:20; Dkt. 95-3 ¶ 8 (showing Mr. Robinson explaining that he sent an Excel spreadsheet of Plaintiff's cases within the specified date range to Mr. Pettit at NTP). After receiving the Excel spreadsheet of Plaintiff's cases, the NTP randomly selected 300 cases to peer review. Dkt. 62-8 at 9:20-11:20; Dkt. 95-1 at 11:11-17,

---

[13] Additionally, Dr. Sherrier's testimony is corroborated by sworn declarations from the Bay Pines PACS IT Administrator, James Robinson, and David Pettit, the former Chief Healthcare Technology Manager for NTP. *See* Dkts. 95-3, 95-9. Specifically, Mr. Robinson attested that Dr. Lenz was not involved in the selection of cases that NTP requested from Mr. Robinson during Plaintiff's 2019 FCCR, and it is only possible to view a PACS audit trail, not edit it. Dkt. 95-3 ¶¶ 5, 12, 14. Mr. Pettit's declaration affirmed Dr. Sherrier's testimony concerning the way in which radiology images are transferred from a VA facility to NTP to complete third-party competency reviews, as well as how the reviewers at NTP assess, score, and comment on the reviewed cases. Dkt. 95-9 ¶¶ 7–8. Mr. Pettit also explained that scoring reports for the competency peer reviews conducted by NTP for Plaintiff's FCCR are referred to as "peer review reports," not audit trails, and include the accession number for each study, the reviewers' scores, and their comments. *Id.* ¶ 14.

13:2-24, 37:11-39:18, 53:3-54:20. Not even Dr. Elamin knows the randomization method used by the NTP to select cases, which is "the whole point. . . we do not interfere in their selection process, to be more impartial." Dkt. 62-8 at 11:2-6.

Importantly, the 299 cases reviewed by the NTP panels did not include any of the nine "trigger cases" initially sent to the NTP. *Id.* at 47:14-25; Dkt. 95-1 at 51:25–52:14. The NTP even excluded one of the randomly chosen CT scans because it was one of the nine trigger cases. Dkt. 62-8 at 47:14-25; Dkt. 62-13 at 1 (explaining that out of the 300 cases selected, "one of the CT cases was a target case and was excluded from the random reviews"). This exclusion resulted in lowering the prior error rate of Plaintiff's reviewed CT scans from eight percent to 7.1 percent. Dkt. 95-1 at 52:4–10. A full examination of the record shows that the only time the NTP "collaborated" with the MEC was *after* the 2019 FCCR was complete to put the results in a "final format." Dkt. 78-22; *see* Dkt. 78-21. Put simply, even after reopening discovery, Plaintiff has not presented a triable issue of fact on whether retaliatory animus "played any part" in the employment decisions to suspend his privileges and place him on the FPPE for cause. *Rosado*, 127 F.4th at 876. To the contrary, the undisputed evidence demonstrates that the adverse employment decisions taken against Plaintiff were justified, and retaliatory animus never "somehow figured into the process that led to the final decision." *Id.*; *see Berry*, 84 F.4th at 1309; *Duncan*, 734 F. App'x at 641. Therefore, Defendant's motion for

35

summary judgment is granted on Plaintiff's retaliation and retaliatory hostile work environment claims in Counts II and IV.[14]

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendant VA's Motion for Summary Judgment, Dkt. 60, is **GRANTED**.

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendant VA on all counts, to **TERMINATE** all pending deadlines, and to **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida, on December 12, 2025.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

<u>**COPIES FURNISHED TO**</u>:
Counsel of Record

---

[14] One final issue of note: because the alleged retaliator (Dr. Lenz) and the ultimate decisionmaker (Director Russo) are two different people, Plaintiff could have raised a "cat's paw" argument. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011); *Llampallas v. Mini-Cirs., Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). However, Plaintiff neither raises the argument nor mentions the words "cat's-paw" in his response, so the Court need not consider it further. *See Michaels v. Sasser's Glass Works, Inc.*, 662 F. Supp. 3d 1223, 1237–38 (S.D. Fla. 2023) (citing *Watts v. Club Madonna, Inc.*, 784 F. App'x 684, 690 n.5 (11th Cir. 2019)); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). Nor does the Court perceive any actionable evidence in support of this theory.